[Cite as *State v. White*, 2017-Ohio-810.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 15AP-815 |
| | | (C.P.C. No. 14CR-2017) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Dennis White, | : | |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on March 7, 2017

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Barbara A. Farnbacher*, for appellee. **Argued:** *Barbara A. Farnbacher*.

**On brief:** *Giorgianni Law LLC,* and *Paul Giorgianni*, for appellant. **Argued:** *Paul Giorgianni*.

APPEAL from the Franklin County Court of Common Pleas

BROWN, J.

{¶ 1} This is an appeal by defendant-appellant, Dennis White, from a judgment of conviction and sentence entered by the Franklin County Court of Common Pleas following a bench trial in which the trial court found him guilty of two counts of kidnapping and four counts of rape.

{¶ 2} On April 17, 2014, appellant was indicted on two counts of kidnapping, in violation of R.C. 2905.01, and four counts of rape, in violation of R.C. 2907.02. The complaint alleged acts arising on or about October 5 and November 13, 1995, involving two victims, V.G. and T.L.

{¶ 3} The matter was tried to the bench beginning April 21, 2015. The first witness for the state was V.G. In 1995, V.G. worked in Columbus performing

housekeeping services.  V.G. and her three children resided with V.G.'s father at the time.

{¶ 4}   In October 1995, V.G. was walking in the area of "18th and Monroe off of Main Street," after taking a bus to that location to look for her teenage daughter.  Unable to locate her daughter, V.G. decided to leave. As she was leaving the area, V.G. encountered a male who "asked where was I going.  He offered me a ride home."  (Tr. Vol. I at 31.)  V.G. got into the vehicle, and the man inquired if she drank beer.  V.G. responded that she did and the man drove to a store to purchase beer.  V.G. drinks "Old English" beer.  (Tr. Vol. I at 35.)  At trial, V.G. identified plaintiff-appellee, the State of Ohio's exhibit No. 28 as two 40 ounce cans of "Old English 800."  (Tr. Vol. I at 37.)

{¶ 5}   The man then drove to the residence of V.G.'s father.  V.G. and the man drank beer on the porch; around midnight, V.G. and the man left her father's residence to get some money.  The man drove to East Livingston Avenue.  He then "got very violent" and said: "Bitch, quit playing games with me.  You know what I want and all this type stuff like that."  (Tr. Vol. I at 40.)  V.G. spoke "smart back" at the man, and he reacted "[r]eal violent" by stopping the vehicle suddenly.  V.G. "felt afraid because [she] didn't know where [she] was," and she "had nothing to protect [her]."  (Tr. Vol. I at 41.)

{¶ 6}   The man drove to the back of a school yard and stopped the vehicle, opening the passenger side door.  V.G. testified that he "forced himself on me inside the car, pulling my clothes and my shorts off to the side."  According to V.G., he was "sexually picking my clothes off and entering me, my leg off, you know, forcing yourself inside someone.  You're laying there trying to look and think something to get away and you can't."  (Tr. Vol. I at 53.)

{¶ 7}   The man "went into the trunk of the car.  He had a belt."  He began pulling V.G. from the vehicle, "[t]rying to tear [her] clothes."  He then dragged her toward a tree.  V.G. testified that he "[p]ut a belt around my neck and just trying to make me suck his [penis].  And I remember biting it and taking off running and screaming.  And I guess [I] must have * * * made him nervous * * * because I remember him running back, getting in the car."  (Tr. Vol. I at 42.)  V.G. wrote down the license plate number of the vehicle on her leg.  (Tr. Vol. I at 49.)  After the man left the area, V.G. called the police from a phone booth.

{¶ 8} At trial, V.G. identified photographs taken of her at a hospital following the incident; she stated that the pictures identified bruising to areas of her neck, arm, knees, and back. V.G. spoke with a police detective at the hospital, and the detective showed her a photographic array. V.G. permitted hospital personnel to conduct testing with a rape kit "[b]ecause I was raped and assaulted and I didn't want * * * diseases." (Tr. Vol. I at 56.) V.G. testified she did not have consensual sex with the man.

{¶ 9} Subsequent to the incident, V.G. thought she saw her assailant drive past her father's house and make a threatening gesture with his hand. V.G. informed detectives that she "didn't want to be involved any more" because she did not want anyone to "come back and harm my father." (Tr. Vol. I at 61.) V.G. also informed police that she did not want to testify in court. At trial, V.G. identified appellant as the individual who assaulted and raped her.

{¶ 10} On cross-examination, V.G. acknowledged she was using crack cocaine in 1995, and she recalled smoking crack cocaine with appellant on the evening at issue. V.G. stated that around that time period she also worked at a "bootleg," an establishment where "they sell illegal drinks—beer, liquor." (Tr. Vol. I at 87.) V.G. became acquainted with prostitutes through her work at the "bootleg." V.G. denied that she had ever engaged in prostitute activity.

{¶ 11} In 1995, Columbus Police Officer Kevin Jackson was assigned to the third shift on the east side of Columbus. On November 14, 1995, Officer Jackson was dispatched to Brookway Road following a report of a rape assault. The officer met a female, later identified as T.L., who stated that the incident occurred at approximately 4:00 a.m. The alleged victim described her assailant as "a male black who had [a] dark complexion, a thin mustache, was balding to no hair, between the age of 22 to 23 years." T.L. provided a description of the man's vehicle as a "dark maroon or burgundy * * * newer model Chrysler New Yorker." (Tr. Vol. I at 112.) Officer Jackson forwarded that information to a detective.

{¶ 12} In 1995, T.L. resided on Brookway Road near Livingston Avenue. T.L. worked at United Dairy Farmers, located at the corner of Livingston Avenue and Barnett Road, within approximately a three-block radius of her residence. T.L. did not have a vehicle at the time, and she walked to work. On November 13, 1995, T.L. walked from her townhome on Brookway Road toward Livingston Avenue. As she approached a

traffic light near Livingston Avenue and Barnett Road, a vehicle pulled up beside her and the driver asked if she needed a ride; the driver was a black male, with a dark complexion. The man "asked me how far was I headed. And I told him just going down the street to United Dairy Farmers. And he said, I'm going in that location also." T.L. testified: "I had been drinking that night and I did get into the car with him." (Tr. Vol. I at 126.)

{¶ 13} The driver "went past Livingston, turned up Barnett [and] went behind United Dairy Farmers." At that point, T.L. thought she "was in big trouble." (Tr. Vol. I at 127.) The man pulled a knife on T.L., pointing it toward her as he drove behind United Dairy Farmers. He stopped the vehicle, "stepped up over the seat over top of [her] and he told [her], bitch, gets your clothes off." (Tr. Vol. I at 128.) T.L. took her clothes off "[b]ecause he had a knife on me." (Tr. Vol. I at 129.) He first pushed T.L.'s head down between his legs, forcing his penis in her mouth. The man then got on top of her. He held the knife to her throat and penetrated her vagina "with his penis." T.L. testified that she "was crying and * * * begging him not to do it and he wouldn't stop. He wouldn't stop until he was finished." (Tr. Vol. I at 130.) The man then "got off of me, set back in the seat of the car, he proceeded to start the car up and tell me, bitch, that wasn't going to be all. The next time he was going to fuck me in my ass and then kill me." (Tr. Vol. I at 131.) The man "told me that * * * wasn't going to be the last time, bitch." (Tr. Vol. I at 118-19.)

{¶ 14} He started the vehicle and began to drive away. T.L. was in "fear of [her] life," and as the vehicle approached a stop sign she "jumped out of the car as it was moving. * * * He sped off." (Tr. Vol. I at 119.) T.L. contacted police, and told an officer she was "assaulted" and that her "life was threatened." (Tr. Vol. I at 120.) T.L. was taken to a hospital for treatment, and a rape kit was administered.

{¶ 15} T.L. testified that none of the activity was consensual. At trial, she identified state's exhibit Nos. 17 and 18 as photographs depicting the location where the incident took place. T.L. stated that she fully cooperated with police during the investigation. On cross-examination, T.L. acknowledged she was intoxicated on the date of the incident, and that she was less than a block from United Dairy Farmers when appellant stopped his vehicle.

{¶ 16} On November 14, 1995, Columbus Police Detective Kenneth Lawson responded to a sexual assault dispatch in which the individual reporting the assault had been taken to a hospital for a forensic examination. Detective Lawson interviewed T.L. that evening at the hospital, and collected several items of clothing and a rape kit containing slides and a swab; the detective submitted those items to the police department's property room.

{¶ 17} A police investigator subsequently provided information to Detective Lawson, advising him to "look at Dennis White." The investigator informed Detective Lawson that the same parking lot "had been used in a prior sexual assault that he was investigating." The investigator showed Detective Lawson "a photo of a license plate that was written on that victim's thigh" in the prior case; the investigator "[s]aid that through his investigation he learned that Dennis [White] was the brother of the person who had that car." (Tr. Vol. I at 168.)

{¶ 18} Detective Lawson prepared a photographic array which included appellant's picture. He showed the array to T.L., who stated that the individual in position number five had a similar skin tone as her assailant, and that the individual in position number six had similar eyes. She did not unequivocally identify any of the individuals in the array as her assailant. Detective Lawson testified that the investigation ended at that point because T.L. "was not interested in pursuing the case and so we classified it as * * * exceptionally cleared." According to the detective, "[t]he lab results came back saying that there was evidence with which we could work, which is why I prepared a search warrant in anticipation of needing blood; but we deferred to [T.L.'s] interest at that time, and she did not want to pursue the case." (Tr. Vol. I at 183.) T.L. told the detective: "I'm not comfortable pursuing a case if I can't say positively who it was." (Tr. Vol. I at 202.)

{¶ 19} Columbus Police Detective Timothy Hedrick, a member of the department's sexual assault unit, testified that he had reviewed old case files pertaining to V.G. and T.L. At trial, Detective Hedrick identified a number of exhibits from those cases, including property submitted to the Ohio Bureau of Criminal Investigation ("BCI") lab for analysis. The department "had a CODIS [Combined DNA Index System] hit come back from the lab identifying the suspect." (Tr. Vol. II at 249.) Detective Hedrick subsequently contacted V.G. and T.L., and both individuals indicated they were willing to cooperate.

After obtaining the "CODIS match * * * from BCI," a warrant was issued and appellant was arrested. (Tr. Vol. II at 251.) Detective Hedrick obtained DNA swabs from appellant at that time and submitted those samples to the BCI lab. According to Detective Hedrick, "[t]he main reason for reopening a case is due to the advancement of the science [and] what the lab can do with the specific property items." (Tr. Vol. II at 246-47.) The detective testified that the basis for charging appellant "was basically the DNA results." (Tr. Vol. II at 275.)

{¶ 20} Police detectives, including Detective Hedrick, interviewed appellant, and the state played a recording of that interview at trial. During the interview, appellant told detectives he did not "even know those women." (Tr. Vol. II at 263.) He also denied giving rides to two women in 1995 in the geographical areas indicated by the alleged victims.

{¶ 21} Hallie Garofalo, a forensic scientist with the DNA unit of BCI, testified that she analyzed DNA collected from V.G. and appellant and prepared a DNA report, dated May 5, 2014, summarizing those test results. Based on the evidence collected, Garofalo opined that appellant "cannot be excluded as the source of the DNA in the sperm fraction of the vaginal slides." (Tr. Vol. I at 214.)

{¶ 22} Garofalo also analyzed DNA collected from T.L. and appellant. Garofalo testified that "[d]ifferential extraction of the vaginal slides * * * resulted in a mixture consistent with contributions from [T.L.] and Dennis White." Garofalo opined that appellant "cannot be excluded as a contributor to the DNA from the vaginal slide." (Tr. Vol. I at 219.)

{¶ 23} At trial, appellant testified on his own behalf, and he acknowledged a 1998 burglary conviction for which he received a seven-year sentence. Appellant stated he was addicted to crack in 1995, and that he engaged in sexual activities with prostitutes at that time.

{¶ 24} Appellant gave the following testimony with respect to his encounter with V.G. on October 5, 1995:

> I met [V.G.] as I was driving down the street. It was kind of late at night and she was walking down the street and she flagged me over. I pulled over and we talked. And I asked her does she have a stem. A stem is a crack pipe. And she said yes. So I told her I had some crack, you know, you want to get

high with me.  So she said yes.  She got in the car.  And in the process of us talking we decided that if I smoke some crack with her she would perform oral sex on me and I will be able to have sex with her.

(Tr. Vol. II at 302.)

{¶ 25} Appellant, who was driving a 1990 Pontiac, stated that he stopped the vehicle because "she was a prostitute.  I knew she was a prostitute and I knew she probably knew where I could go get some crack."  Appellant believed the woman was a prostitute by "the way she was acting."  (Tr. Vol. II at 304.)  According to appellant, after V.G. got inside the vehicle "we just like drive and pull over, smoke, drive, pull over, smoke, pull over, smoke * * * as I recall over towards Scottwood and Barnett."  (Tr. Vol. II at 308-09.)

{¶ 26} Appellant stated he was "rubbing her leg. She's rubbing on my leg." Appellant told the woman: "You know, I want some head.  Can you give me some head? Yeah, sure.  How much are you going to smoke with me?  We going to smoke all of this." (Tr. Vol. II at 309.)  Appellant testified: "We just had sex and she gave me some head." Appellant stated they were together "about four hours."  (Tr. Vol. II at 310.)  He denied driving to the home of V.G.'s father; he also denied observing two bottles of Old English 800, or that he saw V.G. drinking beer.

{¶ 27} Appellant testified that "it got to the point where I got tired of driving and pulling over, hitting, driving, pulling over, hitting. I got tired so I knew a place we could go where it wouldn't be no problem, we just sit there."  (Tr. Vol. II at 311-12.)  He then drove to a location on Scottwood Road and turned off the engine.  Appellant denied forcing V.G. to have sex, and stated she willingly engaged in oral sex.  He also denied using his belt to choke her during the incident.  According to appellant, the encounter ended when they had a disagreement over her taking the last "dope that was there that was mine."  (Tr. Vol. II at 315.)  Appellant told her to get out of the vehicle, and he drove away.

{¶ 28} During direct examination, defense counsel asked appellant why he told detectives he did not use drugs in 1995, and appellant responded: "At that time it was – actually talking about it, it's like a trigger to me.  And I was so shocked for him to say that, I just says no."  (Tr. Vol. II at 317.)  When asked why he told detectives he was not with

T.L. on November 13, 1995, appellant stated that he "couldn't remember who [he] was with." (Tr. Vol. II at 318.)

{¶ 29} Appellant testified that he first encountered T.L. at a crack house where he observed her go into a room with a man. Later, on November 13, 1995, appellant was driving down Livingston Avenue and "she flagged me down." (Tr. Vol. II at 319.) Appellant thought she was a prostitute. Appellant asked T.L. "did she know where I could get some dope." (Tr. Vol. II at 320.) Appellant testified that "[s]he got in the car and we drove over to * * * to get some dope." (Tr. Vol. II at 321.) Appellant gave her $65 and she went inside and returned with drugs.

{¶ 30} They drove away and were "[j]ust riding around pulling over to * * * [s]moke. Trick. She give me some head. I, you know, have sex with her and pull off in that spot and, you know, hit it again, pull over, find another spot." (Tr. Vol. II at 322-23.) They eventually stopped at the location depicted in state's exhibit No. 18. He denied carrying a knife that evening. Appellant testified they had consensual sex at the location.

{¶ 31} Appellant gave the following account as to how the encounter ended:

> Well, after we got down to the last bit of the dope, she asked me did I have any more. I says, no, I don't, I don't have any more. She says, well, you told me that * * * I'm going to be able to take some back to my friend. I said you didn't mention anything to me about no guy, no friend or nothing. So she said yes, I did, yes, I did. I said, no, you didn't. She got to be belligerent with me, you know, argumentative, you know. She just like getting loud and acting, you know, un -- just real unruly, you know, no. I says no, get out. Get out. I asked her to get out the car. She got out.

(Tr. Vol. II at 331-32.)

{¶ 32} On cross-examination, appellant stated he had previously been convicted of two counts of burglary. At the time of the events, appellant lived with his parents at a residence on Quigley Road, Columbus, located near Scottwood Road, and the vehicle he was driving was registered in his brother's name. Appellant acknowledged lying to detectives about whether he used drugs in 1995. He also acknowledged engaging in fellatio and sexual intercourse with V.G. on October 5, 1995, as well as engaging in fellatio and sexual intercourse with T.L. on November 13, 1995.

{¶ 33} During closing argument, the state argued that the primary issue in the case was whether appellant utilized force during the encounters with V.G. and T.L. On May 6, 2015, the trial court announced its verdict from the bench, finding appellant guilty of all counts. On May 11, 2015, the state filed supplemental discovery with respect to hospital records of V.G. transmitted by Grant Hospital to the state after the trial had concluded. Appellant's counsel subsequently filed a motion for mistrial and for new trial, and the state filed a memorandum contra. On July 8, 2015, the trial court conducted a hearing on the motion. By entry filed July 31, 2015, the court denied appellant's motion for mistrial and for new trial.

{¶ 34} The trial court conducted a sentencing hearing on August 5, 2015. During the hearing, counsel for appellant requested that the trial court sentence appellant under the current sentencing laws as opposed to the sentencing laws in effect at the time of the offenses. The trial court determined that appellant "should be sentenced as the law was in 1995." (Tr. Vol. IV at 4.) By judgment entry filed August 11, 2015, the trial court sentenced appellant to indeterminate sentences of 11 to 25 years on each count, with Counts 1, 2, and 3 to be served concurrent to each other, Counts 4, 5, and 6 to be served concurrent to each other, and Counts 2, and 5 to be served consecutive to each other.

{¶ 35} On appeal, appellant sets forth the following four assignments of error for this court's review:

> Assignment of Error 1. The manifest weight of the evidence does not demonstrate beyond a reasonable doubt that Mr. White kidnapped and raped [V.G.].
>
> Assignment of Error 2. The manifest weight of the evidence does not demonstrate beyond a reasonable doubt that Mr. White kidnapped or raped [T.L.].
>
> Assignment of Error 3. Mr. White was deprived of effective assistance of trial counsel.
>
> Assignment of Error 4. Mr. White's sentence is void because he was sentenced under the wrong statute.

{¶ 36} Appellant's first and second assignments of error are interrelated and will be considered together. Under these assignments of error, appellant challenges his kidnapping and rape convictions with respect to V.G. and T.L. as against the manifest

weight of the evidence.  We note appellant does not dispute the fact he engaged in sexual activity with both individuals during the relevant time periods; rather, appellant argues, the primary issue at trial was whether the encounters were consensual.

{¶ 37} Under Ohio law, a manifest weight argument "requires us to engage in a limited weighing of the evidence to determine whether there is enough competent, credible evidence so as to permit reasonable minds to find guilt beyond a reasonable doubt and, thereby, to support the judgment of conviction." *State v. Sexton,* 10th Dist. No. 01AP-398, 2002-Ohio-3617, ¶ 31.  Further, "a reviewing court considering a manifest weight challenge 'may not merely substitute its view for that of the trier of fact.' " *State v. Martin*, 10th Dist. No. 14AP-189, 2014-Ohio-4447, ¶ 20, quoting *State v. Vasquez*, 10th Dist. No. 13AP-366, 2014-Ohio-224, ¶ 49.  Rather, "an appellate court 'must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Martin* at ¶ 20, quoting *Vasquez* at ¶ 49.

{¶ 38} As noted, appellant was convicted of two counts of kidnapping and four counts of rape.  R.C. 2905.01(A)(3) and (4) defines the offense of kidnapping, and states in part: "No person, by force, threat, or deception, * * * shall remove another from the place where the other person is found or restrain the liberty of the other person * * * [t]o terrorize, or to inflict serious physical harm on the victim * * * [or] [t]o engage in sexual activity, as defined in section 2907.01 of the Revised Code, with the victim against the victim's will."  R.C. 2907.02(A)(2) defines the offense of rape, and states: "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force."

{¶ 39} Regarding the testimony of V.G., appellant contends her account of the events was undermined by circumstantial evidence that she was a prostitute.  According to appellant, V.G.'s testimony that she was not a prostitute and that she was raped was no more credible than his testimony that V.G. consensually exchanged crack cocaine for sex.

{¶ 40} The record indicates the trial court permitted defense counsel to explore this issue during cross-examination of V.G.  Specifically, counsel for appellant inquired of V.G. whether she had ever engaged in prostitution, and she denied any such activity.  During closing argument, defense counsel argued that V.G.'s association with known

prostitutes, based on her testimony that she worked at a "bootleg" where illegal drinks were sold, raised credibility issues. Here, the issue raised on cross-examination presented a credibility issue for the trier of fact to resolve, and the trial court was free to believe or disbelieve "all, part, or none" of the witness's testimony. *State v. Gullick,* 10th Dist. No. 13AP-317, 2014-Ohio-1642, ¶ 10.

{¶ 41} Further, even had the trial court credited defense counsel's theme that V.G. had a questionable background or associations, the trier of fact could still have found credible V.G.'s testimony that she did not consent to sex with appellant. *See*, *e.g.*, *Haynes v. State,* 498 S.W.2d 950, 952 (Tex.Crim.App.1973) (Even had it been established that the victim was a prostitute, "this would not have proved consent, or made her any the less the subject of rape by force. A prostitute does not lose the right of choice, and may consent or not consent according to her own will"); *Brewer v. United States,* 559 A.2d 317, 321 (D.C.1988) ("[I]t cannot be assumed that prostitutes will accept every opportunity that comes along to engage in sexual relations. The fact that a woman is a prostitute, which may prove that she has had consensual sex with others, has nothing to do with whether she consented to sexual intercourse with a particular defendant. Even a prostitute can be raped.").

{¶ 42} Appellant also suggests that V.G.'s explanation as to why she did not attempt to flee from the vehicle does not make sense. Appellant contends that V.G. had such an opportunity at the time appellant exited the vehicle and walked to the back of the vehicle to open the trunk. The trier of fact, however, heard testimony from V.G. that she "felt afraid because I didn't know where I was * * * and I had nothing to protect me." (Tr. Vol. I at 41.) V.G. also testified that she wanted to get out of the vehicle but was unable to do so at that point. According to V.G.'s account, she eventually was able to flee after appellant pulled her out of the vehicle and put a belt around her neck. V.G. related that she "went to bite him * * * [o]n his penis," and then "took off running, screaming." (Tr. Vol. I at 52.) The trial court, which heard V.G.'s testimony on this issue, was in the best position to assess the credibility of this witness and determine whether her explanation made sense.

{¶ 43} Appellant next argues that V.G. failed to cooperate with the investigation at the time of the events in question; according to appellant, V.G.'s reticence suggests the

possibility she did not want to tell the truth in 1995.  Appellant also notes that V.G. was reluctant to testify at trial.

{¶ 44} At trial, V.G. explained her reluctance to become involved, stating that she felt threatened by appellant.  Specifically, V.G. related that, shortly after the incident, she thought she saw appellant "ride back past my dad's door."  V.G. testified that she was "standing in the doorway.  And you know how somebody drive by just pointing * * * their finger like [a] gun.  And that's why I told the detectives I didn't want to be involved any more because I didn't want no one to come back and harm my father."  (Tr. Vol. I at 61.) Again, the trial court was in the best position to evaluate V.G.'s testimony regarding reluctance on her part to cooperate or testify, and whether any such reluctance had a bearing on her credibility.

{¶ 45} Appellant also cites V.G.'s testimony in which she admitted to drinking and smoking crack with appellant that evening.  However, based on the testimony presented, the trial court could have concluded that V.G.'s consumption of alcohol or drugs did not prevent her from recalling the events at issue.

{¶ 46} Regarding the testimony of T.L., appellant asserts that it strains credulity to accept the premise that a woman would voluntarily accept a ride with a stranger when she was less than a block from her work location.  In a similar vein, appellant argues that T.L.'s testimony that she never accepted rides from strangers was less than credible under the circumstances.

{¶ 47} Defense counsel explored the above issues during cross-examination of T.L. Specifically, T.L. acknowledged she had been drinking alcohol on the date of the incident, and that she was less than a block from the United Dairy Farmers when appellant stopped.  T.L. testified that she "could have continued to walk to UDF but he said he was headed that direction, also going to UDF."  (Tr. Vol. I at 147.)  T.L. explained that "he seemed like he was a very nice gentleman.  Stopped and asked me my name, thought he knew me."   (Tr. Vol. I at 150.) When asked why she chose to get in the vehicle, T.L. stated: "Because I've always considered myself a good judge of character and he didn't seem like a monster until it jumped out.  Meaning, he's like - - he's a very nice gentleman when he first pulled up approaching me and then after I got in the car - - I called myself being a good judge of people, I was wrong that night."  (Tr. Vol. I at 149-50.)

{¶ 48} Appellant also contends that T.L.'s testimony that she cooperated with police conflicted with the testimony of Detective Lawson. Appellant cites testimony by Detective Lawson stating that T.L. was not interested in pursuing the case at the time. The detective also testified, however, that T.L. had reviewed a photographic array shortly after the events, and that she did not unequivocally identify any of the individuals in the array as her assailant. Detective Lawson testified that T.L. explained at the time she was not comfortable pursuing the case if she could not "say positively who it was." (Tr. Vol. I at 202.)

{¶ 49} The trial court, in reviewing the testimony presented, found both V.G. and T.L. to be credible. Specifically, the court found "[t]he testimony of the victims in this case was fairly consistent * * * with what the defendant ultimately testified to other than the two victims indicating that the defendant had raped them." With respect to V.G., the court found "the physical photographs and evidence were consistent with her testimony." (Tr. Vol. II at 396.) The court noted "[t]he injuries that she sustained were injuries that were consistent with someone that had either been assaulted or someone in which force was used against them," and that "[t]he tag number that she wrote on her leg as to the vehicle that had picked her up connected the defendant to all of this." (Tr. Vol. II at 396-97.) The trial court "likewise" found, based on the "totality of the evidence" presented, that the testimony of T.L. was "credible." (Tr. Vol. II at 397.)

{¶ 50} Upon review, we decline to second-guess the credibility determinations of the trier of fact made following the bench trial in this matter. The trial court heard both V.G. and T.L. testify about appellant's use of force, his display of a knife with respect to T.L., and threats he made to both individuals. As noted by the trial court, in addition to the testimony of the state's witnesses, there was other evidence, including photographs depicting injuries to V.G. as well as DNA evidence, consistent with the state's theory of the case. The trial court also heard the testimony of appellant, who acknowledged lying to detectives about the events at issue, and the court was in the best position to evaluate his credibility. Based on the record presented, we conclude that the trial court did not lose its way or create a manifest miscarriage of justice in finding appellant guilty of kidnapping and rape with respect to V.G. and T.L.

{¶ 51} Accordingly, appellant's first and second assignments of error are without merit and are overruled.

{¶ 52} Under his third assignment of error, appellant contends he was deprived of effective assistance of trial counsel. Specifically, appellant argues his counsel was ineffective by (1) failing to file a motion to dismiss the indictment due to pre-indictment delay, and (2) failing to seek the hospital records of one of the complainants, V.G.

{¶ 53} In order to establish ineffective assistance of counsel, a defendant must demonstrate "first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial." *State v. Drummond,* 111 Ohio St.3d 14, 2006-Ohio-5084, ¶ 205, citing *Strickland v. Washington,* 466 U.S. 668 (1984). In order to show prejudice, the defendant "must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *State v. Bradley,* 42 Ohio St.3d 136 (1989), paragraph three of the syllabus. Further, "[i]n order to prevail on a claim of ineffective assistance of counsel in a case involving a failure to make a motion on behalf of a defendant, the defendant must show '(1) that the motion * * * thereto was meritorious, and (2) that there was a reasonable probability that the verdict would have been different had the motion been made.' " *State v. Kring,* 10th Dist. No. 07AP-610, 2008-Ohio-3290, ¶ 55, quoting *State v. Lawhorn*, 3d Dist. No. 11-04-19, 2005-Ohio-2776, ¶ 35.

{¶ 54} In general, the primary safeguard against pre-indictment delay is the applicable statute of limitations. *State v. Carter,* 5th Dist. No. 07-CA-4, 2007-Ohio-5259, ¶ 16. Additionally, the Due Process Clause of the Fifth Amendment "provides limited protection against preindictment delay." *State v. Adams,* 144 Ohio St.3d 429, 2015-Ohio-3954, ¶ 97. The Supreme Court of Ohio has "recognized a comparable due-process protection under Article I, Section 16 of Ohio Constitution." *Id.* A defendant asserting a due-process violation based on pre-indictment delay "must present evidence establishing substantial prejudice to his right to a fair trial." *Id.* at ¶ 98. If a defendant makes a preliminary showing of substantial prejudice, "then the burden shifts to the state to present evidence of a justifiable reason for the delay." *Id.* at ¶ 99. The Supreme Court has observed, however, that "[t]he burden upon a defendant seeking to prove that preindictment delay violated due process is ' "nearly insurmountable," ' especially because proof of prejudice is always speculative." *Id.* at ¶ 100, quoting *United States v. Montgomery,* 491 Fed.Appx. 683, 691 (6th Cir.2012), quoting *United States v. Rogers*, 118 F.3d 466, 477 (6th Cir.1997), fn. 10.

{¶ 55} Appellant contends that a court considering the issue of pre-indictment delay is first required to weigh the prejudice to the accused from the delay against the state's reason for the delay, and is then required to make a decision that provides the "fundamental fairness" required by the Due Process Clause. In arguing that his trial counsel was ineffective in failing to file a motion to dismiss, appellant focuses primarily on the state's reason for delaying the indictment (i.e., that the alleged victims were not willing to cooperate in the investigation), and asserts that the state's reason is worthy of zero weight. Based on his claim that the state's reason for the pre-indictment delay is worthy of zero weight, appellant maintains he is only required to show the "slightest prejudice" in order to tip the balance in favor of dismissal. In support of his argument, appellant relies in part on several cases from the Eighth District Court of Appeals, including *State v. Dixon,* 8th Dist. No. 102335, 2015-Ohio-3144, *State v. Mack,* 8th Dist. No. 100965, 2014-Ohio-4817, and *State v. Jones,* 8th Dist. No. 101258, 2015-Ohio-2853 ("*Jones I*").

{¶ 56} At the time of oral argument in this case, one of the decisions relied on by appellant, *Jones I* (and which was cited with approval by the court in *Mack*), was pending before the Supreme Court. We note that the Supreme Court recently reversed the Eighth District Court of Appeal's majority decision in *Jones I. See State v. Jones,* ____ Ohio St.3d ____, 2016-Ohio-5105 ("*Jones II*").[1] Because *Jones II* is of significance to issues raised in the instant assignment of error, we begin with a discussion of both *Jones I* and *II.*

{¶ 57} Under the facts of *Jones I,* the defendant filed a motion in the trial court to dismiss his indictment, alleging that the state's 20-year delay in bringing the indictment caused him actual prejudice in defending against a charge of rape. The defendant maintained that he and the victim had engaged in consensual sex in 1993, and the defendant claimed he told police at that time of a consensual encounter. Further, the defendant's mother passed away in 2011, and the defendant argued that his mother would have been able to testify that he and the alleged victim were more than just casual acquaintances and she did not hear anything unusual at the home on the date in question.

---

[1] At the time of oral argument, counsel for appellant acknowledged that the decision of the Eighth District Court of Appeals in *Jones I* was pending before the Supreme Court. Counsel for appellant also filed, subsequent to oral argument, supplemental authority noting the Supreme Court's recent decision in *Jones II.*

The trial court granted the defendant's motion to dismiss, and the state appealed that determination.

{¶ 58} In *Jones I,* the Eighth District Court of Appeals affirmed the judgment of the trial court in a two-to-one decision in which the majority concluded the defendant suffered actual prejudice. Specifically, the majority decision cited evidence that "the identity of the defendant as the accused perpetrator was known from the beginning, * * * the state barely investigated the case and closed it within one week of the start of its investigation, and * * * no further investigation or technological advances occurred in the time between the initial investigation and the indictment." *Id.* at ¶ 47.

{¶ 59} In reaching that determination, the majority evaluated the defendant's claim of actual prejudice "in terms of basic concepts of due process and fundamental justice." *Id.* Furthermore, the court in *Jones I* "considered the reasons for the preindictment delay *prior* to determining actual prejudice." (Emphasis added.) *State v. Smith,* 8th Dist. No. 103586, 2016-Ohio-8043, ¶ 35, citing *Jones I.*

{¶ 60} In *Jones I,* the dissent disagreed with the majority's "application of a less stringent standard for assessing actual prejudice in preindictment delay claims," asserting that "[t]his new so-called 'due process and fundamental justice' standard offered by the majority is in conflict with the long-standing actual or substantial prejudice standard that has been in play over the past three decades in Ohio." *Id.* at ¶ 51 (Gallagher, J., dissenting). The dissent further argued that "a defendant must demonstrate actual prejudice free of speculation before a court considers whether there is a justifiable reason for the delay." *Id.* at ¶ 52. According to the dissent, "shifting the burden to the state to demonstrate a justifiable reason for delay without a showing of actual prejudice circumvents an extended statute of limitations period, invariably defeating legislative intent." *Id.* at ¶ 55.

{¶ 61} On further appeal by the state, the Supreme Court in *Jones II* reversed the judgment of the Eighth District Court of Appeals, reiterating the "firmly established * * * burden-shifting framework for analyzing a due-process claim based on preindictment delay." *Id.* at ¶ 13. Under that analysis, "[o]nce a defendant presents evidence of actual prejudice, the burden shifts to the state to produce evidence of a justifiable reason for the delay." *Id.*

{¶ 62} In *Jones II,* the state argued on appeal that the Eighth District's majority opinion constituted a departure from "well-established precedent requiring a defendant to establish actual prejudice—separate from the state's reasons for the delay—before the burden shifts to the state to justify its delay." *Id.* at ¶ 14. The Supreme Court agreed, finding that the majority "blurred the distinctions between the existence of actual prejudice and the lack of a justifiable reason for the delay by focusing almost exclusively on the actions and inactions of the police." *Id.* at ¶ 15. Specifically, the Supreme Court held that the "majority's focus on the actions and inactions of the police * * * demonstrates the majority's abandonment of the two-step, burden-shifting analysis for determining whether preindictment delay constitutes a due-process violation." *Id.* at ¶ 18. Thus, "[b]y considering the reasons for the state's delay before independently determining whether Jones established actual prejudice because of that delay, the Eighth District majority erred." *Id.*

{¶ 63} The Supreme Court then turned to the state's second primary argument, i.e., that the Eighth District majority "ignored precedent by concluding that Jones established actual prejudice." *Id.* at ¶ 19. According to the state, the record contained "only speculation regarding the exculpatory value of the allegedly lost or otherwise unavailable evidence." *Id.*

{¶ 64} In examining the issue of actual prejudice, the Supreme Court noted that "[a] determination of actual prejudice involves ' "a delicate judgment" ' and a case-by-case consideration of the particular circumstances." *Id.* at ¶ 20, quoting *State v. Walls,* 96 Ohio St.3d 437, 2002-Ohio-5059, ¶ 52, quoting *United States v. Marion,* 404 U.S. 307, 325 (1971). Further, the court "must 'consider the evidence as it exists when the indictment is filed and the prejudice the defendant will suffer at trial due to the delay.' " *Id.,* quoting *Walls* at ¶ 52. The court also acknowledged its prior decisions suggesting that "speculative prejudice does not satisfy the defendant's burden." *Id.*

{¶ 65} In *Jones II,* the Supreme Court specifically "reject[ed] the Eighth District majority's application of an amorphous standard based on concepts of fundamental justice to determine the existence of actual prejudice." *Id.* at ¶ 23. The Supreme Court observed that "[e]ach time this court has considered preindictment delay, we have scrutinized the claim of prejudice vis-à-vis the particular evidence that was lost or

unavailable as a result of the delay and, in particular, considered the relevance of the lost evidence and its purported effect on the defense." *Id.*

{¶ 66} The Supreme Court cited several of its prior decisions, *State v. Luck,* 15 Ohio St.3d 150 (1984), and *Adams,* as offering guidance in considering the issue of actual prejudice. In *Luck,* the defendant asserted he had suffered prejudice from a 15-year delay in prosecution where two key witnesses had died, including one witness who was purportedly present at the shooting victim's apartment at the time she was killed; further, under the facts of that case, all of the tape-recorded interviews with potential witnesses and suspects compiled by the police department had been destroyed. *See id.* at 154. The court in *Luck* found the defendant was " 'obviously prejudiced by not being able to seek verification of her story from [the witness purportedly with the defendant at the time of the alleged murder] and thereby establish mitigating factors or a defense to the charge against her.' " *Jones II* at ¶ 25, quoting *Luck* at 158. Accordingly, "the proven unavailability of specific evidence or testimony that would attack the credibility or weight of the state's evidence against a defendant, and thereby aid in establishing a defense, may satisfy the due-process requirement of actual prejudice." *Id.* The death of a potential witness, however, "will not always constitute actual prejudice." *Id.* at ¶ 26. In the *Adams* decision, the Supreme Court found no actual prejudice from pre-indictment delay where the defendant "did not explain what evidence the deceased witness 'might have offered,' and * * * the deceased witness had actually implicated Adams in the murder before he died." *Id.*, quoting *Adams* at ¶ 103.

{¶ 67} In *Jones II,* the Supreme Court agreed with the Eighth District's "dissent's concerns about a defendant's reliance on mere speculation to support a claim of actual prejudice." *Id.* at ¶ 27. In this respect, "the possibility of faded memories, inaccessible witnesses, and lost evidence is insufficient to demonstrate actual prejudice." *Id.* Rather, "[t]hose are 'the real possibilit[ies] of prejudice inherent in any extended delay,' and statutes of limitations sufficiently protect against them." *Id.* at ¶ 21, quoting *Marion* at 326. Instead, "[a]ctual prejudice exists when missing evidence or unavailable testimony, identified by the defendant and relevant to the defense, would minimize or eliminate the impact of the state's evidence and bolster the defense." *Id.* at ¶ 28.

{¶ 68} We recognize that the parties in this case did not have the benefit of the decision in *Jones II* at the time of briefing before this court. In light of that decision,

however, we find unpersuasive appellant's argument that he need only demonstrate the "slightest prejudice" in order to tip the balance in favor of dismissal based on his assertion that the state's reason for the pre-indictment delay is worthy of zero weight. As noted, the Eighth District's majority in *Jones I* focused primarily on the inactivity of police, and "considered the reasons for the preindictment delay prior to determining actual prejudice." *Smith* at ¶ 35, citing *Jones I.* In *Jones II,* however, the Supreme Court "determined that actual prejudice is the first step in establishing unjustifiable preindictment delay." *Smith* at ¶ 35, citing *Jones II* at ¶ 13. *See also State v. Rusnak,* 7th Dist. No. 15 JE 0002, 2016-Ohio-7820, ¶ 8, citing *Jones II* at ¶ 18 (noting "[t]he state has no duty to present evidence justifying a delay until the defendant establishes actual prejudice").

{¶ 69} In the present case, appellant asserts that the record shows his defense was prejudiced by pre-indictment delay in the following five respects: (1) at the time of trial, V.G. was no longer a crack addict and, therefore, she "almost certainly" presented herself as a more credible and reliable witness in 2015 than she would have in 1995, (2) T.L. "probably" presented herself as a more credible and reliable witness in 2015 than in 1995 in light of her testimony that she had an alcohol problem in 1995, (3) facing accusers of such "dubious character," appellant "almost certainly" would not have waived his constitutional right to a jury trial had he been prosecuted in 1995, (4) the passage of two decades likely influenced how the trier of fact would have viewed appellant's credibility because his account of cruising the city seeking to exchange crack for sex seems less plausible now to "modern ears" than it would have seemed 20 years ago, and (5) the passage of time inevitably affects memories.

{¶ 70} As cited above, actual prejudice exists "when missing evidence or unavailable testimony, identified by the defendant and relevant to the defense, would minimize or eliminate the impact of the state's evidence and bolster the defense." *Jones II* at ¶ 28. Further, proof of actual prejudice "must be specific, particularized and non-speculative." *State v. Stricker*, 10th Dist. No. 03AP-746, 2004-Ohio-3557, ¶ 36.

{¶ 71} Here, appellant does not point to any particular missing evidence or unavailable witnesses. To the extent appellant argues there is a possibility that V.G. or T.L. would have presented themselves as more credible witnesses in 2015 than in 1995, or that he almost certainly would not have waived his right to a jury trial in 1995, such claims

are speculative and do not meet the actual or substantial prejudice requirement. Similarly, whether the passage of time would have influenced "modern ears" to find appellant's account less plausible is also speculative.

{¶ 72} Appellant also contends the passage of time inevitably affects memories, and that both V.G. and T.L. did not remember certain details during their testimony, including V.G.'s testimony that she did not recall what year she stopped using crack, and T.L.'s statement that she did not remember whether she was going to work on the date of the incident. However, "the possibility of faded memories, unavailable witnesses, and lost or destroyed evidence does not, in and of itself, constitute actual prejudice." *State v. Smith*, 8th Dist. No. 104203, 2016-Ohio-7893, ¶ 19, citing *Jones II* at ¶ 21. On review of the record presented, including the testimony of V.G. and T.L., we do not find that appellant demonstrated substantial prejudice from the fact these witnesses may not have recalled certain details. *See, e.g., State v. Battiste,* 8th Dist. No. 102299, 2015-Ohio-3586, ¶ 51 (nothing in the record to suggest appellant was prejudiced by witnesses inability to recall certain details; defense counsel, in fact, utilized the inability of one witness to recall certain details to appellant's advantage); *Smith*, 2016-Ohio-7893 at ¶ 20 (rejecting appellant's claim that memories of the offense were severely compromised by nearly 20-year delay; record belied appellant's assertion as victim's account of rape on reopening of case was consistent account as reported at time of incident); *State v. Clark,* 12th Dist. No. CA2007-03-037, 2008-Ohio-5208, ¶ 49 ("although appellant argues that he was prejudiced by defense witnesses' faded memories, he has not shown how the witnesses' recollection of the altercation would have changed the outcome of the trial").

{¶ 73} On review of the record of proceedings and relevant case law, including *Jones II*, we find that appellant has not established a reasonable probability of success had trial counsel filed a motion to dismiss on the basis of pre-indictment delay. As such, appellant was not prejudiced as a result of his trial counsel's alleged ineffectiveness. Further, because appellant has failed to establish the prejudice prong of *Strickland,* we need not consider the state's reasons for the pre-indictment delay. *Adams* at ¶ 107.

{¶ 74} Appellant also contends his trial counsel was ineffective in failing to seek the hospital records of one of the complainants, V.G. According to appellant, notations in the medical records of V.G. suggest she may have told a hospital scrivener that the incident

occurred in her father's basement and that she may have known her assailant. Appellant maintains that such evidence would have cast doubt on her credibility.

{¶ 75} In response, the state argues that the trial court considered the information contained in the medical record in denying appellant's motion for mistrial and for new trial, and that appellant cannot demonstrate prejudice. We agree.

{¶ 76} By way of background, following the trial court's finding of guilt as to all counts, but prior to sentencing, the state filed a supplemental discovery of hospital records involving V.G. The state requested the medical records prior to trial, but the prosecutor's office did not receive the records until after trial, at which time it supplemented discovery and sent the documents to appellant's counsel. Appellant's counsel subsequently filed a motion for mistrial and for new trial.

{¶ 77} The trial court conducted a hearing on the motion and, prior to sentencing, the trial court filed an entry denying appellant's motion. In its decision, the court held in part:

> Here the question for this court to consider is whether the information in the medical records was of such value that it adversely affects the substantial rights of the defendant and as to whether the result would have been different had the evidence been available for trial. [To] both questions the court answers no.
>
> The information within the medical records was written by someone other than the victim so it is unknown if the information could have been misinterpreted or misconstrued. If the information in the medical records is what [V.G.] said on the night of the incident then it would be potential impeachment. However, at trial, the defendant testified that he did not know [V.G.] and all other information presented at trial, her not being able to pick the defendant out of a photo array in 1995 and having to write down the tag number of the defendant's car, the night of the incident, for identification purposes is consistent with [V.G.] not knowing the defendant.
>
> * * *
>
> The defendant argues that if he had the information prior to trial that the defense strategy would have been different. The defense strategy at trial was that the sex was consensual and that the victims were upset because the defendant did not provide them more drugs which motivated both to lie about

their encounter with the defendant. The defendant did not deny that sexual contact had occurred, which was confirmed by DNA. Other than saying maybe the defendant would not have testified if they were aware of this document prior to trial the defendant does not provide any specifics regarding a change in strategy.

(July 31, 2015 Entry at 3-4.)

{¶ 78} As reflected above, the hospital records at issue were the subject of appellant's motion for mistrial and for new trial. The trial court considered the notations in the medical records and determined that, even had such evidence been available for trial, the result of the trial would not have been different. On review, we conclude that appellant has not demonstrated a reasonable probability that the result of the trial would have been different but for counsel's failure to subpoena the hospital records of V.G.

{¶ 79} Based on the foregoing, appellant's third assignment of error is not well-taken and is overruled.

{¶ 80} Under his fourth assignment of error, appellant challenges his sentence as contrary to law, arguing that the trial court erred in sentencing him under the law in effect at the time of the offenses rather than the law in effect at the time of sentencing. Appellant cites R.C. 1.58(B)[2] as generally providing that an amendment reducing a criminal penalty is applicable to cases in which the sentence is imposed after the effective date of the amendment. Appellant notes that, between 1990 and 1996, the sentence for rape was an indeterminate term of 4 to 25 years under former R.C. 2929.11(B)(4) and Am.Sub.S.B. No. 258 ("S.B. No. 258"). Further, effective September 30, 2011, following the enactment of 2011 Am.Sub.H.B. No. 86 ("H.B. No. 86"), the legislature reduced the sentence for rape to a definite term of between 3 and 11 years. Appellant maintains that a defendant who committed his offense when S.B. No. 258 was in effect, but who was sentenced after H.B. No. 86 became effective in 2011, is required to be sentenced under H.B. No. 86.

{¶ 81} In response, the state contends that appellant's approach represents a misapplication of H.B. No. 86 and R.C. 1.58. The state argues that the General Assembly,

---

[2] R.C. 1.58(B) states: "If the penalty, forfeiture, or punishment for any offense is reduced by a reenactment or amendment of a statute, the penalty, forfeiture, or punishment, if not already imposed, shall be imposed according to the statute as amended."

under Am.Sub.S.B. No. 2 ("S.B. No. 2"), expressly chose to make changes applicable only to new crimes occurring on or after S.B. No. 2's effective date of July 1, 1996.  According to the state, sentencing under H.B. No. 86 is still sentencing under the scheme as created by S.B. No. 2, and that the S.B. No. 2 sentencing scheme does not apply to prior offenders.

{¶ 82} Subsequent to the time for filing briefs in this case, the Supreme Court recently addressed the conflict between S.B. No. 2 and H.B. No. 86.  In *State v. Thomas,* ___ Ohio St.3d ___, 2016-Ohio-5567, the defendant committed the offenses of rape and kidnapping in 1993, prior to the effective date of S.B. No. 2 (July 1, 1996), but was not sentenced until 2014, after the effective date of H.B. No. 86 (September 30, 2011).  In that case, the trial court applied the sentencing law in effect at the time of the 1993 offenses, and imposed an 8 to 25-year prison sentence on the rape count, and an 8 to 25-year prison sentence on the kidnapping count.

{¶ 83} The defendant appealed his sentence to the Eighth District Court of Appeals, arguing that he should have been sentenced under H.B. No. 86, the law in effect at the time of his 2014 sentencing.  The state, on the other hand, argued that H.B. No. 86 was an extension of S.B. No. 2 and only applied to offenses committed on or after its effective date of July 1, 1996.  As relevant to the defendant in *Thomas,* "the law in effect in 2014 reduced the potential prison sentences for first degree felony rape and kidnapping as compared with the potential prison sentences for those offenses under the law in effect in 1993." *Thomas* at ¶ 1.  The appellate court agreed with the defendant and vacated his sentence, remanding for resentencing.  The state appealed, and the Supreme Court accepted jurisdiction to consider the state's proposition of law that a defendant who commits an offense prior to July 1, 1996 should be subject to the law in effect at the time of the offense and not subject to the sentencing provisions of S.B. No. 2 and H.B. No. 86.

{¶ 84} In *Thomas,* at ¶ 18, the Supreme Court determined that the defendant was entitled to the benefit of the shorter sentence under H.B. No. 86, holding in part:

> The amendments to R.C. 2929.14(A) in H.B. 86 reduced the potential sentences for Thomas's offenses, rendering H.B. 86 generally applicable to him under its uncodified law and R.C. 1.58. This irreconcilably conflicts with the uncodified law of S.B. 2, amended by S.B. 269, which states that subsequent sentencing law is inapplicable to offenders who committed their crimes prior to July 1, 1996. Applying the appropriate

statutory construction provision, we hold that H.B. 86
controls as the later-enacted provision.

{¶ 85} In the present case, appellant committed his offense prior to the enactment of S.B. No. 2, but was convicted and sentenced subsequent to the 2011 enactment of H.B. No. 86. In accordance with the holding in *Thomas,* appellant was entitled to be sentenced under the provisions of H.B. No. 86. Accordingly, we agree with appellant that the trial court erred in imposing sentence under the sentencing laws in effect at the time of the offenses. We, therefore, sustain appellant's fourth assignment of error, vacate his sentence, and remand this matter to the trial court for the limited purpose of resentencing under H.B. No. 86.

{¶ 86} Based on the foregoing, appellant's first, second, and third assignments of error are overruled, appellant's fourth assignment of error is sustained, the judgment of the Franklin County Court of Common Pleas is affirmed in part and reversed in part, appellant's sentence is vacated, and this matter is remanded to that court for the limited purpose of resentencing.

*Judgment affirmed in part and reversed in part;*
*cause remanded.*

SADLER and LUPER SCHUSTER, JJ., concur.

_____