[Cite as *State v. Hunter*, 2024-Ohio-5782.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                          :

     Plaintiff-Appellee,                          :

                                        No. 23AP-468

v.                                                     :            (C.P.C. No. 22CR-3440)

Anthony Mandell Hunter,                                :            (REGULAR CALENDAR)

     Defendant-Appellant.                         :

---

D E C I S I O N

Rendered on December 10, 2024

---

**On brief:** *G. Gary Tyack*, Prosecuting Attorney, and *Michael A. Walsh*, for appellee.

**On brief:** *Keith A. Yeazel*, for appellant.

---

APPEAL from the Franklin County Court of Common Pleas

DORRIAN, J.

{¶ 1} Defendant-appellant, Anthony Mandell Hunter, appeals from the July 25, 2023 judgment of the Franklin County Court of Common Pleas convicting him, pursuant to jury verdict, of one count of kidnapping, a felony of the first degree, in violation of R.C. 2905.01, and one count of assault, a misdemeanor of the first degree, in violation of R.C. 2903.13, and finding him to be a repeat violent offender pursuant to R.C. 2941.149. Because appellant's convictions and the court's finding are not against the manifest weight of the evidence, we affirm.

**I. Facts and Procedural History**

{¶ 2} Appellant and R.T. dated on and off for approximately seven or eight years. They tell two different stories regarding what occurred from Sunday, July 24 into Monday, July 25, 2022 which led to appellant being charged with kidnapping, a felony of the first

degree, in violation of R.C. 2905.01, and assault, a misdemeanor of the first degree, in violation of R.C. 2903.13.

{¶ 3} According to R.T., she and appellant were hanging out at her apartment on Shawnee Way in Reynoldsburg, Franklin County, Ohio. They drank beer and vodka and by 3:00 or 4:00 in the morning of July 25, 2022, both she and appellant were intoxicated. Appellant demanded she call her ex-boyfriend to find out where he lived. She refused. R.T. testified she "[did not] know exactly how it all happened when he finally tied [her] up and -- with electrical wires on [her] arms -- [her] wrists and bound [her] with socks and bound [her] ankles together with his belt." (Tr. Vol. II at 213.) This took place on the floor in the living room in front of the couch, but she could not remember "if [appellant] told [her] to lay down and [she] laid down or if [appellant] physically did it." (Tr. Vol. II at 214.) R.T. testified she was not okay with appellant doing this and she and appellant had never before consensually engaged in this sort of behavior. This lasted for longer than ten minutes and appellant was smiling and demanding that R.T. call her ex-boyfriend at the same time. R.T. was not able to yell for help because appellant gagged her with socks.

{¶ 4} R.T. testified that at some point appellant retrieved a knife from the chopping block in her kitchen. He returned and put the knife up against her throat. Appellant continued to demand R.T. call her ex-boyfriend and that they go over to his house. Appellant threatened to kill R.T., her ex-boyfriend, and himself. R.T. asked appellant to let her call her sister, N.M., to see if she knew where the ex-boyfriend lived. Appellant permitted R.T. to call N.M. and took the gag away from her mouth so she could talk. R.T. called N.M. and asked her if she knew where her ex-boyfriend lived. N.M. asked R.T. what was going on and, although R.T. did not tell N.M. what was going on, R.T. believes her sister "kind of heard it in [R.T.'s] voice." (Tr. Vol. II at 229.)

{¶ 5} After R.T. called N.M., appellant untied R.T. and they sat there like nothing happened. Then, approximately 20 minutes after the phone call, N.M. arrived at the apartment. N.M. and appellant engaged in a verbal dispute. Appellant then left the apartment. Then N.M. left.

{¶ 6} After he left, appellant then called R.T. a couple times because he had urinated on himself in his car. Appellant apologized and told R.T. he "didn't mean to do it and he wouldn't do it again [and] kept saying he was sorry." (Tr. Vol. II at 234.) R.T. let

appellant back in the apartment and eventually they both fell asleep. When asked if she was still drinking at this point, R.T. answered "No. I don't think I was. I could have been, but I don't think I was." (Tr. Vol. II at 237-38.)

{¶ 7} When R.T. and appellant woke up, appellant started yelling, screaming, and choking her with one hand up against the wall until she could not really breathe. Appellant then stopped choking her, got himself upset again and then choked her again, twice with one hand and once with two hands. She did not call police because he broke her phone. When asked why she did not leave in between the choking incidents, R.T. testified:

> I don't know why I didn't leave. I don't know. I know when I told him I wanted to leave, he would kind of stand in front of me so I couldn't move. And when I asked to leave, that's when I asked him could I leave to go get my mother. I said if I don't pick her up, she's going to know something is wrong. So I was asking could I leave, and he wasn't letting me leave the [apartment].

(Tr. Vol. II at 245-46.)

{¶ 8} When appellant went to the use the bathroom, R.T. grabbed her purse and keys and ran out of her apartment as fast as she could to her car. Appellant ran out of the apartment and tried to stop her, but R.T. was able to drive to her mother's house and call police. R.T. met police at her apartment, but appellant was not there.

{¶ 9} R.T. testified that because of this incident, something "popped" in her neck and she has to reposition her body to this day. (Tr. Vol. II at 262.) R.T. also sought counseling from a therapist.

{¶ 10} On cross-examination, appellant's counsel questioned R.T. about discrepancies between her testimony and answers she had previously given when questioned by appellant's investigator. Discrepancies included: whether an ACE bandage or a sweatshirt was used to secure the socks in her mouth; timing; what appellant was wearing; the length of time she was tied up; whether she was lying on her back or her side; and whether she or appellant initiated the call to speak with each other after N.M. left. Appellant's counsel also questioned R.T. why neither she nor N.M. called police. Appellant's counsel further cross-examined R.T. regarding her petition for a civil protection order and the narrative she wrote regarding the incident, including a statement that appellant was dragging her. R.T. testified appellant threatened to call police and tell them

that she had domestically assaulted him—and that would not be good for her job clearance. She affirmed she would not have her federal government security clearance if she were charged with domestic violence.

{¶ 11} Upon cross-examination, R.T. also testified that she had called appellant's counsel's office and left a voicemail indicating she wanted to drop the charges and had called appellant's investigator and told him she just wanted to be done with this because she had a protection order and was not afraid of appellant. R.T. conceded that she did tell appellant's investigator "something to the effect of, even though he didn't put his hands on me, I don't have any injuries to show, no pictures of injuries, just one picture [of] my wrist but that wasn't an injury, that's it, there's nothing." (Tr. Vol. II at 301.) She clarified that by stating he did not put his hands on her, she meant appellant did not hit her.

{¶ 12} On redirect examination, R.T. testified that appellant had knowledge of her security clearance for her job and in the past had threatened he would mess with her clearance. She also testified someone from appellant's family had contacted her before she told the investigator that she wanted to drop the charges.

{¶ 13} R.T.'s sister, N.M., testified for the State of Ohio, plaintiff-appellee. According to N.M., R.T. called her sometime around 5:00 a.m. on July 25, 2022. R.T. asked N.M. for a phone number for her ex-boyfriend who had been a long-time friend of the family. N.M. testified that R.T.'s voice did not sound good—a little nervous—and N.M. wondered why R.T. was calling her at 5:00 a.m. in the morning. N.M. also heard a male voice in the background telling R.T. to ask her for a number. After the call ended, N.M. went over to R.T.'s apartment and observed that the apartment was a mess and R.T. and appellant were drinking and "both were very drunk." (Tr. Vol. II at 326.) N.M. testified that R.T. told her what happened. Then N.M. confronted appellant about why he tied up R.T.:

> And I said, Why would you tie her up like that? You hog-tied her like she's an animal. She's not an animal. Why would you even do that? And, like I said, at first he denied it. Then he said, Oh, it was just more of an erotic thing. I said, Come on now. That's not erotic. And you are having her calling me asking me for numbers and things like that. And he finally said, No, I was mad because I thought she was cheating.

(Tr. Vol. II at 328.)

{¶ 14} N.M. testified that appellant admitted to her that he tied up R.T. and gagged her but she did not think he admitted to holding a knife to her. N.M. observed welt marks on R.T.'s wrists and took photos of them. Appellant finally left the apartment while N.M. was still at the apartment. N.M. stated she left it up to R.T. to call police. N.M. later called her and R.T.'s mother who was a former Franklin County Sheriff's Deputy.

{¶ 15} Jackie Bowman also testified for the state. Bowman lived in the apartment below R.T. at the time of the incident. Bowman heard a lot of thumping and pounding coming from R.T.'s apartment from approximately 9:00 to 11:00 a.m. on July 25, 2022. The noises resumed around 3:00 p.m. that day when Bowman was sitting outside reading. She heard a lot of yelling from appellant that he had broken R.T.'s phone so she could not call anyone. Bowman heard R.T. trying to get appellant to leave but he would not. Bowman testified R.T. came running by her patio and asked her to call 911, but appellant ran by chasing R.T. and told Bowman to mind her own business while he continued yelling at R.T. Bowman called 911. Police arrived and got appellant out of the apartment, then they asked Bowman for a statement.

{¶ 16} Sergeant Ronald Wright of the Reynoldsburg division of Police also testified for the state. Sergeant Wright was dispatched to the apartment on Shawnee Way on July 25, 2022 at approximately 5:00 p.m. on an emergency call involving a report of an assault and possibly kidnapping. Sergeant Wright arrived, and Officers Nicholas Rubenstahl, Ricardo Thompson, and Otis Merrill were already at the scene. Detective Nicole Riley arrived later after Sergeant Wright left for another scene. Sergeant Wright observed a broken phone, an apartment in disarray, and an "RCA" cord. (Tr. Vol. II at 380-81.) He also observed a slight redness on both R.T.'s wrists.[1]

---

[1] State's exhibits A1-A24 are photos introduced by the state and admitted into evidence. R.T. testified the photos depicted the living room where appellant tied her up, the broken cell phone, the cord appellant used to tie her wrists, the socks appellant used to gag her, and the knife appellant used to threaten her. The state also introduced, and the court admitted, photographs depicting R.T.'s wrists with redness from the cords. (*See* State's Exs. B1-B3.) In addition to the photos, the state introduced, and the court admitted, the knife used to threaten R.T., her broken cell phone, the cords used to tie her wrists, and the socks used to gag her. (*See* State's Exs. C-F.) Finally, the state introduced, and the court admitted, state's exhibit G, a belt; however, R.T. was not sure if it was the belt appellant used to tie her ankles.

{¶ 17} The state rested after redirect examining Sergeant Wright. Appellant moved for dismissal pursuant to Crim.R. 29 for lack of sufficient evidence. The court denied the same.

{¶ 18} Appellant testified on his own behalf.[2] Appellant stated he drinks a lot but that he had not "really blacked out like this present time we're talking about since college days." (Tr. Vol. III at 443.) He further stated R.T. drinks every single time he sees her. She even drinks early in the morning and to the point where she blacks out and does not remember much the next day. Appellant testified he had previously called police four times on R.T., but in the end he told police he did not want to press charges.

{¶ 19} According to appellant, his ex-wife called him while he was at R.T.'s apartment. The call prompted R.T. to ask him many questions about his ex-wife and tell him that she knew he had gone out of town with his ex-wife recently. From there, appellant turned the conversation to R.T.'s ex-boyfriend.

{¶ 20} Appellant testified that when he went to R.T.'s apartment, he did not have a belt on or with him. He denied he tied her ankles with a belt and put socks in her mouth. He denied "piss[ing] on himself." (Tr. Vol. II at 474.) He denied holding a knife to R.T.'s neck. He denied telling R.T. that he was going to kill her and wrap her in a purple robe. He denied telling R.T. he would kill her ex-boyfriend and denied he told her he would kill her. He testified "I never did anything remotely close to tying her up, dragging her around the [apartment], choking her in three different spots. * * * No, it did not happen." (Tr. Vol. III at 491-93.) On cross-examination, appellant confirmed that his testimony "is essentially that [R.T.] has completely fabricated her whole story as it relates to tying her up and assaulting her later in the day." (Tr. Vol. III at 499.) He testified N.M. was lying when she testified that he told her he tied up R.T. Appellant testified that Bowman probably heard him yelling, but she was lying about hearing him say he had broken R.T.'s phone so she could not call anyone and about appellant trying to prevent R.T. from getting in her apartment.

---

[2] Appellant began by admitting he had previously been convicted of manslaughter and tampering with evidence. The court instructed the jury they were to consider that information for the "sole and limited purpose of considering the credibility of the witness and absolutely nothing more." (Tr. Vol. III at 435.) Appellant further testified he was on post-release control at the time he was testifying, and one of the conditions is he is not permitted to come into close proximity of a firearm.

{¶ 21} Appellant and R.T. continued bickering about his ex-wife and R.T.'s ex-boyfriend. R.T. told appellant that she and her ex-boyfriend were just friends and she could prove it. Appellant then challenged her to prove it. This prompted R.T. to call N.M., to try and prove it. Then N.M. arrived at R.T.'s apartment. Appellant "really exchanged some words [with her, saying] some smart stuff to her." (Tr. Vol. III at 472.) Then, appellant left and went to his son's mother's house.

{¶ 22} Appellant testified that R.T. called him to come back to the apartment after her sister left. He returned to R.T.'s apartment early in the morning. At that time, R.T. was still drinking, and so was appellant. He stayed at R.T.'s apartment, and they resumed talking about their exes. R.T. asked him "to break our phones" and delete all the photos including photos and texts of other women and R.T. (Tr. Vol. III at 477.) Together, they broke each other's phones. Appellant bent and snapped her phone, and R.T. stomped on his phone. They continued consuming alcohol. Eventually R.T. logged into her work computer and then went back to her bedroom, and appellant stayed on the sofa and passed out. At some point appellant woke up because R.T. was kicking him telling him he had "pissed on" himself and that he had to get her a new phone. (Tr. Vol. III at 482.) R.T. had a "total different attitude [and volume]" and in response he told her "F*** it" and that her ex-boyfriend should go get her one. (Tr. Vol. III at 482.) Appellant went to the bathroom and when he came out, R.T. was pulling her car out of the drive way. He went out to the sidewalk and R.T. began yelling "F*** you" at appellant. (Tr. Vol. III at 483.)

{¶ 23} Appellant testified he is a loud talker and a heavy walker. He stated the apartment has paper-thin walls. At some point a couple days prior to the evening and morning of July 24-25, 2022, R.T. told appellant she was going through a security clearance with her job and that she was going to lose her job because of him.

{¶ 24} The jury found appellant guilty of kidnapping, in violation of R.C. 2905.01, a felony of the first degree, and assault, in violation of R.C. 2903.13, a misdemeanor of the first degree. The court then found that appellant was a repeat violent offender pursuant to R.C. 2941.149. The court sentenced appellant to an indefinite sentence of a minimum of 8 years and a maximum of 12 years on Count 1 and 180 days on Count 2 to run concurrent with each other. The court also imposed a period of post-release control of 2 to 5 years.

{¶ 25} Appellant timely appealed.

## II. Assignment of Error

{¶ 26} Appellant appeals and assigns the following sole assignment of error for our review:

> The verdicts are against the manifest weight of the evidence.

## III. Analysis

{¶ 27} Appellant argues that his convictions were against the manifest weight of the evidence and in particular that issues regarding the state's witnesses' credibility, inconsistent testimony, lack of evidence of resistance, and lack of physical evidence give rise to reasonable doubt and are compelling evidence that the jury lost its way.

{¶ 28} "[T]he criminal manifest weight of the evidence standard addresses the evidence's effect of inducing belief." *State v. Cervantes*, 10th Dist. No. 18AP-505, 2019-Ohio-1373, ¶ 26, quoting *State v. Cassell*, 10th Dist. No. 08AP-1093, 2010-Ohio-1881, ¶ 38. " 'When presented with a manifest-weight challenge, an appellate court may not merely substitute its view for that of the trier of fact but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Id.* at ¶ 27, quoting *State v. Patterson*, 10th Dist. No. 15AP-1117, 2016-Ohio-7130, ¶ 34, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1977), citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). An appellate court should reserve reversal of a conviction as being against the manifest weight of the evidence for only the most " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *Martin* at 175.

{¶ 29} Appellant argues his defense is that R.T. made up the story of kidnapping to save her job and she was angry because appellant was cheating on her with his ex-wife. He argues his defense is "plausible," because of the state's witnesses' lack of credibility, inconsistencies in testimony, lack of evidence of resistance or struggle, and lack of physical evidence. (Appellant's Brief at 17.) For these reasons, appellant argues generally that the verdicts are against the manifest weight of the evidence. He does not argue that the jury's findings regarding any particular elements of the offenses of kidnapping and assault were against the manifest weight of the evidence.

{¶ 30} Regarding credibility, appellant argues R.T. was not credible because she had been drinking for over 12 hours and her testimony was filled with "I'm not sure," "I don't know," and "I don't remember."[3]

{¶ 31} In conducting a manifest weight of the evidence review, we may consider the credibility of the witnesses. *Cervantes* at ¶ 28, citing *State v. Cattledge*, 10th Dist. No. 10AP-105, 2010-Ohio-4953, ¶ 6. However, in conducting such review, "we are guided by the presumption that the jury, or the trial court in a bench trial, is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." (Internal quotations omitted.) *Id.*, quoting *Cervantes* at ¶ 6, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). " 'Accordingly, we afford great deference to the jury's determination of witness credibility.' " *Id.*, quoting *State v. Albert*, 10th Dist. No. 14AP-30, 2015-Ohio-249, ¶ 14. " 'Mere disagreement over the credibility of witnesses is not a sufficient reason to reverse a judgment on manifest weight grounds.' " *Id.*, quoting *State v. Harris*, 10th Dist. No. 13AP-770, 2014-Ohio-2501, ¶ 25, *discretionary appeal not allowed*,

---

[3] The excerpted portions of R.T.'s testimony to which appellant points as being not credible are as follows: "I'm not sure if I started [drinking] when he got there or if I was already drinking." (Tr. Vol. II at 205.) "I really don't [know about how much I had to drink]." (Tr. Vol. II at 206.) "I don't know exactly how much [appellant] had to drink." (Tr. Vol. II at 207.) "I don't remember how [my ex-boyfriend's name] got brought up." (Tr. Vol. II at 208.) "I do not remember [if he physically placed me on the floor]. I don't know if he told me to lay down and I laid down or if he physically did it." (Tr. Vol. II at 214.) "I don't know if he went to get the cord first or if I was on the ground first. I'm not sure." (Tr. Vol. II at 214.) "I don't know exactly how it all happened when he finally tied me up and -- with electrical wires on my arms -- my wrists and bound me with socks and bound my ankles together with his belt." (Tr. Vol. II at 213.) "I don't know where he would have got [an ACE bandage] from." (Tr. Vol. II at 220.) "I don't know [why I did not scream for help when appellant took the gag off so I could call my sister]." (Tr. Vol. II at 228.) "I don't remember [if N.M.] confronted him." (Tr. Vol. II at 231.) "I don't know [why I did not call police after I was untied and still had my phone]." (Tr. Vol. II at 231.) "I'm not sure if [N.M.] left first or if he left first." (Tr. Vol. II at 232.) "No." I do not "remember all the times of everything that happened from back on July 25th of 2022." (Tr. Vol. II at 232.) "No, [I do not remember when I stopped drinking that night]. It was late. Toward the morning." (Tr. Vol. II at 233.) "I don't know [about how long before I start getting these phone calls from appellant after he left]." (Tr. Vol. II at 234.) "I don't know [why I let him back in]." (Tr. Vol. II at 235.) "I don't know if I went to sleep first or he went to sleep first, but we eventually both fell asleep." (Tr. Vol. II at 236.) "No. I don't think I was [drinking when I let appellant back in at 9:00, 10:00, or 11:00]. I could have been, but I don't think I was." (Tr. Vol. II at 237-38.) "Not sure [if appellant had another drink after I let him back in]." (Tr. Vol. II at 238.) "[I woke him up and told him he urinated on himself]. And I -- I don't know what I was doing, but --. * * * I don't know exactly what I was doing and stuff after that. But once he got up, that's when he started to choke me." (Tr. Vol. II at 239.) "I can't really remember exactly what he was yelling about." (Tr. Vol. II at 239.) "No. I don't remember what he said [when he picked up the phone and broke it]." (Tr. Vol. II at 243.) "I'm not sure which time he used both hands." (Tr. Vol. II at 244.) "I don't recall if I was drinking when he got there." (Tr. Vol. II at 273.) "I don't remember saying that to [the investigator that all of this went from 1:00 to 6:00 a.m.]." (Tr. Vol. II at 276.) "Well, I don't remember then. I know where I was laying at when I was tied up." (Tr. Vol. II at 294.)

140 Ohio St.3d 1455, 2014-Ohio-4414, citing *State v. G.G.*, 10th Dist. No. 12AP-188, 2012-Ohio-5902, ¶ 7.

{¶ 32} "[A]n appellate court may not substitute its judgment for that of the trier of fact on the issue of the credibility of the witnesses unless it is patently apparent that the factfinder lost its way." (Internal quotations omitted.) *State v. Gamble*, 10th Dist. No. 20AP-378, 2021-Ohio-4089, ¶ 8, quoting *State v. Guice*, 10th Dist. No. 18AP-305, 2019-Ohio-1324, ¶ 24, quoting *State v. Williams*, 10th Dist. No. 10AP-779, 2011-Ohio-4760, ¶ 21, quoting *State v. Woullard*, 158 Ohio App.3d 31, 2004-Ohio-3395, ¶ 81 (2d Dist.).

{¶ 33} In support of his argument that R.T. was not credible, appellant points in particular to the excerpted portions of R.T.'s testimony at transcript Vol. II 205-08; 213-14; 220, 228, 231-39, 243-44, 273, 276, and 294 which are noted in the footnote 3. In considering appellant's argument regarding these excerpts and appellant's arguments regarding credibility, this court has taken into consideration the context of the excerpts, the specific question(s) which prompted the response excerpted and any clarifications following the response, as well as all of R.T.'s testimony and the testimony of other witnesses and admitted exhibits. *See State v. R.I.H.*, 10th Dist. No. 18AP-93, 2019-Ohio-2189, ¶ 41 (this court considered the appellant's argument related to credibility "in the context of our review of the entire record"). We have also taken into consideration the relevance of the excerpted response as to the elements of the offenses with which appellant was charged which the state had to prove. *See State v. Hoyle*, 10th Dist. No. 22AP-19, 2023-Ohio-899, ¶ 11 (this court considered the appellant's arguments regarding credibility and found that the particular testimony which the appellant argued was inconsistent was "largely related to ancillary matters and did not, when viewed in context, undermine the credibility as a whole of [the witnesses'] testimony"). Finally, we have taken into consideration that the jury heard and observed all of these excerpts and considered the same. The jury was also well aware of the amount of alcohol consumed by R.T. and appellant. *See State v. Ndiaye*, 10th Dist. No. 19AP-10, 2020-Ohio-1008, ¶ 41 (this court considered the appellant's argument related to credibility and observed that the trial court, as the trier of fact, "was in the best position to weigh the credibility of [the witness's] testimony, in the context in which it was given").

{¶ 34} Following our review of the record, we cannot say it is patently apparent that the jury in this case lost its way in believing the testimony of R.T. and the other state's witnesses over the testimony of appellant. Therefore, we are not persuaded, on the facts of this case, R.T.'s drinking and her testimony to which appellant points warrant reversal on manifest weight grounds.

{¶ 35} Regarding inconsistencies in testimony, appellant points to R.T.'s testimony that she was gagged by socks but was not previously screaming. Appellant also points to R.T.'s statement to investigators that the socks were held in her mouth by an ACE bandage and not the yellow sweatshirt, compared to her testimony at trial that the socks were held in her mouth by the yellow sweatshirt and not the ACE bandage. Appellant points as well to R.T.'s statement to investigators that she was tied up for about one hour but testified at trial she had been tied up for about ten minutes.

{¶ 36} A jury may take note of inconsistencies and resolve them accordingly, " 'believ[ing] all, part, or none of a witness's testimony.' " *State v. Henderson*, 10th Dist. No. 10AP-1029, 2011-Ohio-4761, ¶ 22, quoting *State v. Raver*, 10th Dist. No. 02AP-604, 2003-Ohio-958, ¶ 21, citing *State v. Antill*, 176 Ohio St. 61, 67 (1964).

{¶ 37} Further, " '[a] defendant is not entitled to a reversal on manifest weight grounds merely because inconsistent evidence was presented at trial.' " *Cervantes* at ¶ 48, quoting *State v. Scott*, 10th Dist. No. 10AP-174, 2010-Ohio-5869, ¶ 16.

{¶ 38} R.T. was thoroughly cross-examined on inconsistencies in her testimony as well as discrepancies between her testimony and the report she gave the investigator. The jury heard the cross-examination and considered the same.

{¶ 39} Following our review of the record, we cannot say that appellant is entitled to reversal merely because of the inconsistencies to which he points. Therefore, we are not persuaded, on the facts of this case, that the inconsistencies warrant a reversal on manifest weight grounds.

{¶ 40} Regarding lack of evidence of resistance, appellant argues there was no evidence of struggle, and no evidence of resistance. Appellant points to: (1) R.T.'s testimony that she did not call police until after she picked her mother up at 4:00 p.m. the next day, (2) N.M.'s testimony that she did not call police, (3) R.T.'s testimony that she was afraid

appellant was calling police on her, and (4) R.T.'s testimony that she allowed appellant to return to the apartment after she claims he tied her up.

{¶ 41} Appellant does not acknowledge evidence of struggle and resistance which the state presented and does not acknowledge any explanations R.T. and N.M. gave. R.T. testified that when she tried to leave her apartment, "he would kind of stand in front of me so I couldn't move. * * * I was asking could I leave, and he wasn't letting me leave the [apartment]." (Tr. Vol II at 245-46.) N.M. testified that appellant had left the apartment and that she left it up to R.T. to call police, she did however notify her and R.T.'s mother who was a former Franklin County Sheriff's Deputy. Bowman testified that R.T. came running by her patio and asked her to call 911. Bowman also testified she has heard a lot of yelling coming from R.T.'s apartment and that appellant had broken R.T.'s phone so she could not call anyone. R.T. testified that she did not call police because appellant broke her phone. The jury in this case heard all of the testimony regarding resistance, struggle, or lack thereof, to which appellant points. The jury was in the best position to assess the credibility of R.T. and N.M. and consider the evidence of resistance or struggle and determine whether their explanations made sense. *State v. White*, 10th Dist. No. 15AP-815, 2017-Ohio-810, ¶ 42.

{¶ 42} Following our review of the record, we cannot say that this court was in a better position to assess the witnesses' explanations and testimony regarding struggle, resistance, or lack thereof. Therefore, on the facts of this case, we are not persuaded that the evidence of resistance, struggle, or lack thereof warrant a reversal on manifest weight grounds.

{¶ 43} Finally, regarding lack of physical evidence, appellant argues there was no evidence of R.T. being bound tightly around her wrists. He further argues that even though R.T. testified she had been dragged across the carpet, there was no evidence of having a rug burn. Appellant further argues there was no belt found at the scene, that R.T. was not sure if exhibit H was the belt in question, and appellant's testimony that he was not even wearing a belt.

{¶ 44} This court has repeatedly stated that "[a] lack of physical evidence, standing alone, does not render [a defendant's] conviction against the manifest weight of the evidence." (Internal quotations omitted.) *State v. Daylong*, 10th Dist. No. 19AP-279, 2021-

Ohio-4192, ¶ 53, quoting *State v. Murray*, 10th Dist. No. 16AP-16, 2017-Ohio-949, ¶ 38, quoting *State v. Peeples*, 10th Dist. No. 13AP-1026, 2014-Ohio-4064, ¶ 21, citing *State v. Conner*, 10th Dist. No. 12AP-698, 2013-Ohio-2773, ¶ 12. " 'If [witness] testimony is believed then the lack of * * * any other [type of] physical evidence does not render the conviction against the manifest weight of the evidence.' " *Peeples* at ¶ 21, quoting *State v. Jackson*, 7th Dist. No. 09 JE 13, 2009-Ohio-6407, ¶ 16 (concluding a conviction based on victim's testimony identifying the defendant was not against the manifest weight of the evidence).

{¶ 45} Here again, appellant does not acknowledge the physical evidence which the state presented. N.M. testified she observed welt marks on R.T.'s wrists. Sergeant Wright also testified he observed slight redness on both of R.T.'s wrists. Exhibits B1-B3 are photographs of R.T.'s wrists and arms showing slight redness around the wrists. In addition, Exhibits A13-A14 are photographs of R.T.'s phone.

{¶ 46} Following our review of the record, we cannot say that there was a lack of physical evidence to the extent appellant suggests. Furthermore, the jury's belief in R.T.'s testimony as well as the other witnesses presented by the state suffices even where physical evidence is lacking. Therefore, on the facts of this case, we are not persuaded that physical evidence or the lack thereof in this case warrant a reversal on manifest weight grounds.

{¶ 47} Accordingly, we find that this is not "the exceptional case in which the evidence weighs heavily against conviction." *Thompkins* at 387, quoting *Martin* at 175. Therefore, the judgment in this case was not against the manifest weight of the evidence. Thus, we overrule appellant's assignment of error.

## IV. Conclusion

{¶ 48} For the foregoing reasons, we overrule appellant's assignment of error and affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

JAMISON and LELAND, JJ., concur.

———————